UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAMUEL R. "RICK" HALL, ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | 1:06-cv-01106-RLY-TAB | |
| ) | | |
| THE BROWN COUNTY BOARD OF ) | | |
| COMMISSIONERS, ROBERT "BUCK" ) | | |
| STOGSDILL, Sheriff of Brown County, in ) | | |
| his official and individual capacities, AMY ) | | |
| COUCH, Brown County Commissioner, in ) | | |
| her official and individual capacities, and ) | | |
| STEPHANIE YAGER, Brown County ) | | |
| Commissioner, in her official and individual ) | | |
| capacities, ) | | |
| Defendants. ) | | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On July 22, 2005, Plaintiff, Samuel R. "Rick" Hall ("Plaintiff") was terminated from his position as the Director of the Brown County Emergency Management Advisory Council ("EMAC" or "Advisory Council") by the Brown County Board of Commissioners ("BOC") for misuse of county property. Following his termination, Plaintiff brought the instant lawsuit against the BOC; Robert "Buck" Stogsdill, Sheriff of Brown County ("Stogsdill" or "Sheriff"), in his official and individual capacities; Amy Couch ("Couch"), Brown County Commissioner, in her official and individual capacities; and Stephanie Yager ("Yager"), Brown County Commissioner, in her official and individual capacities (collectively "Defendants"). His seven-Count Complaint includes

1

claims for intentional interference with an employment relationship against the BOC, Couch, and Yager (Counts I-III), defamation against the BOC, Couch, Yager, and Stogsdill (Counts IV-VI), and a civil rights claim under 42 U.S.C. § 1983 ("Section 1983") for violation of his Fifth and Fourteenth Amendment procedural due process rights (Count VII). Defendants now move for summary judgment. For the reasons explained below, the court hereby **GRANTS** Defendants' motion.

**I.     Facts**

    **A.     Background**

1. At all relevant times, Yager was President of the BOC, and Couch was a member of the BOC. (Amended Complaint ¶¶ 5, 6).

2. Plaintiff was employed as Director of Emergency Management from July 14, 2003, to July 18, 2005. (Amended Complaint ¶¶ 6, 8; Defendant's Ex. 4).

3. Pursuant to Brown County Ordinance No. 03-02-98-01 (the "Ordinance"), the Director of Emergency Management is appointed by the County's Advisory Council with the approval of the County Executive (in this case, the BOC). (Defendant's Ex. 5 at § 3(E)(1)).

4. The Ordinance provides that the appointment of the Director "is permanent" unless the Advisory Council finds him "[i]ncapable of fulfilling his/her duties due to physical or mental disability" or "unwilling to perform his/her duties." (Defendants' Ex. 5 at § 3(E)(3)).

5. The Ordinance further provides that "[t]he Advisory Council shall have the power

        to terminate, with the approval of the County Executive, a county Emergency Management Director, under the circumstances delineated in Section 3(E)(2) hereof (*see* Finding of Fact # 4)).  (Defendant's Ex. 5 at § 3(C)(2)).

6.     Plaintiff was hired as Director of Emergency Management on July 14, 2003, pursuant to Section 3(E)(1) of the Ordinance, after he was interviewed and recommended to the BOC by the Advisory Council.  (Deposition of Amy Couch ("Couch Dep.") at 24).

7.     Prior to commencing his employment, Plaintiff took an oath of office, in which he solemnly swore to uphold the Constitution and to "faithfully, impartially, and honestly discharge the duties of [his] office."  (Plaintiff's Ex. E).

8.     Several weeks after Plaintiff was hired, Plaintiff signed an Applicant Statement, acknowledging that "unless otherwise defined by applicable law," his employment relationship "with this organization is of an "*at-will*" nature . . . ."  (Defendants' Ex. 6) (emphasis in original).

        **B.**     **Account Irregularities**

9.     In the Spring of 2005, Yager sat on a multi-hazard mitigation plan committee.  (Deposition of Stephanie Yager ("Yager Dep.") at 25-26).

10.    While serving on the committee, Yager was issued an invoice for $40,000.00 for which there was no line item in the budget.  (Yager Dep. at 26).

11.    Yager began looking into the grants to see if something had been paid in error out of that grant fund specifically.  (Yager Dep. at 26).

12. Yager came across documents reflecting an open county account at Fifth Third Bank. (Yager Dep. at 26).

13. Yager brought the information regarding the existence of a Fifth Third Bank account to the attention of the County Auditor. (Yager Dep. at 26).

14. The County Auditor thereafter worked with Couch to determine why a bank account had been set up without their knowledge. (Yager Dep. at 26).

15. After Couch and the Auditor completed their review of the issue, they brought their concerns to the BOC. (Yager Dep. at 27).

16. In June 2005, Mike Clephane, an Indiana State Police Officer working in the White Collar Crime Unit ("Officer Clephane"), notified Couch that Plaintiff might have committed fiscal improprieties. (Couch Dep. at 72).

17. Couch conversed with Officer Clephane regarding these matters approximately five times. (Couch Dep. at 72).

18. At that time, and during all relevant times below, there was no active Advisory Council in Brown County. (Couch Dep. at 55, 73, 74; Yager Dep. at 72).

    **C.   The Executive Session of the BOC and Plaintiff's Suspension**

19. On June 22, 2005, an executive session of the BOC took place. Present at the meeting were Plaintiff, Plaintiff's attorney, Jim Roberts, and the three members[1] of the BOC. (Deposition of Samuel R. "Rick" Hall ("Plaintiff Dep.") at 43).

20. During the executive session, which was tape recorded, the BOC asked Plaintiff a

---

[1] Blake Wolpert was the third commissioner sitting on the BOC at that time.

series of questions, which he answered. (Plaintiff Dep. at 43, 45, 100-01).

21. Plaintiff's answers revealed that Plaintiff took county computers, radios, and generators to his home, and had even constructed a radio tower at his residence. (Yager Dep. at 36; Couch Dep. at 61).

22. The BOC did not know what funds were used to accomplish this "command center" in Plaintiff's residence. (Yager Dep. at 36). This undertaking was done without authorization of the BOC or the Advisory Council. (Yager Dep. at 31, 36).

23. Yager testified that it was her understanding that, pursuant to state statute, only the BOC had authority to establish an alternative emergency operation center. (Yager Dep. at 37).

24. The BOC also learned that Plaintiff had been using his personal vehicles, namely a Geo Tracker and Jeep Cherokee, for unauthorized purposes, having fueled and repaired them at county expense. They further learned that balances were still outstanding on the county's Shell credit card, the payments for which had been approved by the BOC and not yet received by Shell. (Couch Dep. at 51-53, 68).

25. In addition, Plaintiff admitted that he opened an account at Fifth Third Bank using the county's federal I.D. number, without the BOC's knowledge or consent. (Couch Dep. at 65-66).

26. Plaintiff further confirmed that grant funds had been deposited in said account, along with Plaintiff's own personal funds. (Couch Dep. at 66).

27. The BOC voiced its concerns to Plaintiff regarding this unauthorized activity, gave him a chance to respond to those concerns, and directed him to return the property immediately. (Couch Dep. at 64). The BOC also made clear to Plaintiff that there was to be no more activity out of the Fifth Third bank account, as the commingling of county funds with Plaintiff's personal funds was "a big problem." (Couch Dep. at 66).

28. Following the executive session, a public session was held, at which time the BOC voted to suspend Plaintiff from his position as Emergency Management Director. (Plaintiff Dep. at 43).

29. In making their decision to suspend Plaintiff, the BOC relied upon the advice of the county attorney. (Yager Dep. at 17-18, 21, 31-34; Couch Dep. at 37).

### D. Plaintiff's Termination

30. After the BOC suspended Plaintiff and told him there was to be no further activity on the Fifth Third bank account, it came to their attention that a check was written by Plaintiff in the amount of $6,000.00 to pay off Plaintiff's Jeep Cherokee. (Couch Dep. at 67).

31. On July 18, 2005, the BOC sent Plaintiff a Notice of Dismissal, stating that after an investigation into his conduct, the BOC found violations of the county employment policy justifying dismissal. These violations included "the misuse of county property, improper claims, and failure to comply with the order of suspension dated June 20, 2005." (Defendants' Ex. 4).

### E. Subsequent Audit and Grand Jury Indictment

32. On April 11, 2007, the State Board of Accounts completed an Audit Report of the records of the Emergency Management Agency for the period of January 1, 2004, to June 30, 2005, to the BOC. (Defendants' Supplemental Ex. 6; Plaintiff Dep. at 74).

33. The report showed over $64,017.00 in unauthorized expenses incurred by Plaintiff. (Defendants' Supplemental Ex. 6; Plaintiff Dep. at 75, 77).

34. A criminal investigation of Plaintiff's activities culminated in a grand jury indictment against Plaintiff for Official Misconduct, a Class D felony. (Defendants' Supplemental Ex. 4).

## II. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it is outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "genuine" where the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.*, 98 F.3d 262, 264

(7th Cir. 1996).  While the moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-moving party may not simply rest on the pleadings, but "must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial."  *Id*.  If the non-moving party fails to make a sufficient showing on an issue to which he has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Ripberger v. Western Ohio Pizza, Inc.*, 908 F.Supp. 614, 617 (S.D. Ind. 1995) (*citing Celotex Corp.,* 477 U.S. at 323).

### III. Discussion

#### A. Procedural Due Process

In order to prevail on his procedural due process claim, Plaintiff must demonstrate: "(1) a cognizable property interest; (2) a deprivation of that interest; and (3) a denial of due process."  *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993).  The threshold question under such an examination is whether a property interest actually exists.  *Id*.  Defendants first argue that Plaintiff did not have a property interest in his position as Emergency Management Director.  The court begins its discussion by addressing that argument below.

##### 1. Property Interest

Under Indiana law, there are two basic forms of employment: (1) employment for a definite or ascertainable term; and (2) employment at-will.  *Orr v. Westminster Village North*, 689 N.E.2d 712, 717 (Ind. 1997).  In *Orr*, the Indiana Supreme Court explained:

> If there is an employment contract for a definite term, and the employer has not reserved the right to terminate the employment before the conclusion of the contract, the employer generally may not terminate the employment relationship before the end of the specified term except for cause or by mutual agreement. If there is no definite or ascertainable term of employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party.

*Id.*

Here, Defendants contend that Plaintiff's employment was at-will, and was thus terminable at any time with or without cause. In support of Defendants' argument, they cite to Plaintiff's Applicant Statement, which Plaintiff read and signed prior to being hired. The Applicant Statement reads, in pertinent part:

> I hereby understand and acknowledge that, unless otherwise defined by applicable law, any employment relationship with this organization is of an "*at will*" nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without cause. It is further understood that this "*at will*" employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization.

(Defendants' Ex. 6) (emphasis in original).

Plaintiff responds that Plaintiff's employment was for a definite or ascertainable term, as evidenced by the Ordinance and by the oath of office he took prior to commencing his employment as Director. The applicable provisions of the Ordinance are found at Section 3(E):

> 1.  The Director of Emergency Management shall be appointed by the County Emergency Management Advisory Council with the approval of the county executive [i.e., the BOC].

      2.      The appointment of the Director shall be permanent unless the Advisory Council, pursuant to Section 3(C)(2) hereof, determines the Director to be:

           a.      Incapable of fulfilling his/her duties due to physical or mental disability, or
           b.      unwilling to perform his/her duties as mandated below.

In addition, Section 3(C)(2) provides:

      2.      The Advisory Council shall have the power to terminate, with the approval of the County Executive, a county Emergency Management Director, under the circumstances delineated in Section 3(E)(2) hereof.

(Defendants' Ex. 5 at § 3(E)(1), (2)).

The court finds that the Ordinance provides sufficient evidence that Plaintiff had a contract of employment for a definite or ascertainable term. *See City of Terre Haute v. Brown*, 483 N.E.2d 786, 787 (Ind. Ct. App. 1985) ("The employment status [of firemen] is created by the combination of relevant statutes, ordinances . . . which prescribe duties and procedures such as appointment, compensation, demotion and hearings; such laws affecting employment become a part of the contract as if their terms were expressly referred to or incorporated therein."); *City of Indianapolis v. Sherman*, 409 N.E.2d 1202, 1207 (Ind.Ct.App. 1980) ("[A] duly appointed police officer, who has taken the required oath, and entered into the performance of his duties as a policeman, has a valid written contract of employment . . . ."). The Ordinance provides that Plaintiff's position is permanent unless the Advisory Council, with the approval of the BOC, determines that the circumstances delineated in Section 3(E)(2) are met. The Ordinance is therefore an

10

"otherwise applicable law," signed by the BOC, that trumps the Applicant Statement's "at will" provision. Because the Ordinance provides the terms of Plaintiff's employment and sets specific conditions upon which his termination can be based, the court finds that Plaintiff's employment is contractual in nature, and is protected by due process.

### 2. Due Process

Defendants next argue that Plaintiff received constitutionally adequate due process. "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In determining what process is due, the court must consider three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335.

With respect to the first factor, as discussed above, Plaintiff had a legitimate property interest in his position as Director of Emergency Management. Plaintiff argues that he was "stripped" of that interest because (1) he could only be terminated by the Advisory Council and (2) that neither Yager nor Couch "were ever informed that [Plaintiff] was incapable of fulfilling his duties or unwilling to fulfill them." (Plaintiff's Response at 13). Plaintiff's response is really a challenge to the authority of the BOC to

11

terminate Plaintiff under the terms of the Ordinance. This issue dovetails into two related issues: (1) whether the BOC had evidence that Plaintiff was incapable of fulfilling his duties under Section 3(E)(2) of the Ordinance; and (2) whether the BOC had the authority to terminate Plaintiff without Advisory Council's initial findings of wrongdoing under Section 3(E)(2).

The Ordinance provides the Advisory Council "shall have the power to terminate, with the approval of the County Executive, a county Emergency Management Director, under the circumstances delineated in Section 3(E)(2) hereof." (Defendant's Ex. 5 at § 3(C)(2)). Section 3(E)(2) of the Ordinance lists the conditions under which the Director may be terminated. These include where the Advisory Council determines the Director to be incapable of fulling his duties due to mental or physical disability or unwilling to perform those duties "as mandated below." (Defendant's Ex. 5 at § 3(E)(2)). Section 3(F) of the Ordinance lists the Director's Powers and Duties. Specifically, Section 3(F) provides in relevant part:

> The Director, subject to the direction and control of the Advisory Council, shall be executive head of the Department and shall have responsibility for the organization, administration, and operation of the emergency management organization, including the following specific powers and duties:
>
> * * *
>
> 23.   competently managing the department's various functions, including among others financial, personnel, and logistic;
>
> * * *

      26.    assuring the activities of the Department at all times conform with I.C. 10-4-1-10[2] and other applicable statutes and county ordinances.

(Defendant's Ex. 5 at § 3(F)).  Section 3(F), as incorporated into Section 3(E), unambiguously provides that where the Director of Emergency Management is unwilling to perform the duties listed in Section 3(F), the Director is subject to termination.

      Here, Plaintiff admitted to commingling personal and county funds; setting up a county bank account with Fifth Third without the BOC's knowledge or consent; misusing county funds by, *inter alia*, filling up his gas tank with a county credit card; misusing county property by, *inter alia*, transferring county computers, generators, and radios to his own home; as well as other fiscal improprieties.  These actions clearly establish that Plaintiff was not performing his duties as mandated in numbered paragraphs 23 and 26 of Section 3(F) of the Ordinance.  Instead, he was acting outside his authority and contrary to his obligations under the Ordinance and state statute.  Thus, Plaintiff was clearly subject to termination for those improprieties under the unambiguous language of the Ordinance.

      The next issue for the court to address is whether the BOC acted outside its authority in terminating Plaintiff.  Plaintiff argues that only the Advisory Council had the authority to terminate Plaintiff.  However, at the time of Plaintiff's suspension and termination, for reasons unknown, there was no active Advisory Council.  Thus, it was not possible for the Advisory Council to make initial findings.  Moreover, although

---

[2] Indiana Code § 10-4-1-10 has been amended to § 10-14-3-17.

Section 3(E)(2) purports to give the Advisory Council the power to terminate the Director of Emergency Management, Section 3(C)(2) clarifies that the Advisory Council's power is not exclusive; indeed, the BOC had the ultimate authority to terminate the Director of Emergency Management.  (*See* Defendant's Ex. 5 at § 3(C)(2) ("The Advisory Council shall have the power to terminate, *with the approval of the County Executive . . .*") (emphasis added)).  The court therefore finds that the BOC had the power to terminate Plaintiff under the express terms of the Ordinance.

With respect to the second factor – the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards –  Plaintiff argues that the BOC acted outside its authority by failing to consult with the Executive Director of SEMA.  Section 3(E)(3) governs this issue and provides:

> The Advisory Council shall consult with the Executive Director of SEMA to obtain his/her opinion on the abilities and competence of the Director prior to the Advisory Council's termination of the Director under Section 3(E)(2).  The SEMA Executive Director's opinion hereunder <u>shall be advisory only</u>.

(Defendant's Ex. 5 at § 3(E)(3) (emphasis in original).

As is evident from a plain reading of Section 3(E)(3), the SEMA Executive Director's opinion was a procedural safeguard and not a substantive requirement.  As a matter of law, Plaintiff does not have a property interest in that procedure.  *Fortner v. Fleming*, 2001 U.S. Dist. LEXIS 22831, at *10 (S.D. Ind. Nov. 26, 2001) (citing *Fleury v. Clayton*, 847 F.2d 1229, 1231 (7th Cir. 1988)) ("There is no property interest in

procedures themselves."). Thus, to the extent the SEMA Executive Director's advisory opinion was required under the Ordinance, the BOC's failure to obtain that opinion does not raise a constitutional violation. Accordingly, for the reasons set forth above, the court finds that the BOC had the power to terminate Plaintiff under the express terms of the Ordinance. The court further finds, under the facts and circumstances of this case, that the BOC's failure to contact the Executive Director of SEMA did not create a risk of an erroneous deprivation of his property interest in his position as Director of Emergency Management. Indeed, the court would be hard pressed to find a SEMA Executive Director, confronted with the facts known to the BOC, who would not agree with the BOC's decision.

With respect to the third factor, Plaintiff argues that he does not have to make a showing that contacting the Executive Director of SEMA was unduly burdensome because it is a statutory requirement. While the court recognizes that contacting the Executive Director of SEMA may not have been unduly burdensome and was, in fact, a requirement set forth in the Ordinance, the court finds that this third factor does not weigh in favor of his due process claim because the SEMA Executive Director's opinion was merely advisory.

In sum, the Ordinance did not require that a hearing be conducted prior to Plaintiff's termination. It merely required the Advisory Council to determine, with the approval of the BOC, that Plaintiff was, *inter alia*, unwilling to perform his duties as Director of Emergency Management. (Defendants' Ex. 5 at §§ 3(E)(2), 3(C)(2)).

Nevertheless, in an abundance of caution, the BOC provided him with a hearing, with his attorney present, at which time he was given a meaningful opportunity to be heard. *See Eldridge*, 424 U.S. at 902 ("The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."). After admitting to the allegations made against him, he was suspended for improper use of county funds. An investigation ensued, at which time the BOC discovered additional fiscal improprieties. The BOC then terminated Plaintiff's position. The court finds, based on this record and a consideration of the *Eldridge* factors listed above, that Plaintiff was given all the process that was constitutionally required in order to protect his property interest in his position as Director of Emergency Management. *See, e.g., City of Indianapolis v. Tabak*, 441 N.E.2d 494, 498 (Ind.Ct.App. 1982) (where plaintiff, a second-hand goods dealer, was arrested for receiving stolen property, and where City Controller revoked plaintiff's second-hand goods license based upon the arrest, a post-deprivation hearing initiated ten days after the deprivation was constitutionally adequate). Defendants' Motion for Summary Judgment on Count VII of Plaintiff's Amended Complaint is therefore **GRANTED**.

      **B.**    **State Law Claims**

Plaintiff also brings state law claims for intentional interference with an employment relationship (Counts I-III), and defamation (Counts IV-VI). These claims are Plaintiff's sole remaining claims. As such, before ruling, the court must decide whether to exercise supplemental jurisdiction over his remaining state law claims. *Groce*

*v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

Title 28, United States Code, Section 1367(e) provides that a district court may decline to exercise supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law"; or "(2) the district court has dismissed all claims over which it has original jurisdiction." Plaintiff's only federal claim for relief – his procedural due process claim – has been dismissed. Thus, the original basis for the court's jurisdiction no longer exists. Given this procedural posture, the court declines to exercise supplemental jurisdiction over these state law claims, and **DISMISSES** his state law claims without prejudice. *See Groce*, 193 F.3d at 501 ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

**IV.    Conclusion**

For the reasons set forth above, the court **GRANTS** Defendants' Motion for Summary Judgment (Docket # 38) on Plaintiff's procedural due process claims alleged in Count VII, and **DISMISSES** without prejudice Plaintiff's state law claims for intentional interference with an employment relationship (Counts I-III) and defamation (Counts IV-VI).

**SO ORDERED** this  5th   day of August 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Paul Anthony Logan
HASKIN LAUTER  & LARUE
plogan@hlllaw.com

Jay  Meisenhelder
HASKIN LAUTER  & LARUE
jmeisenhelder@hlllaw.com

Caren L. Pollack
MANDEL POLLACK & HORN
cpollack@mplaw.net